UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


UNITED STATES OF AMERICA )
) No. 2:08-CR-39
V. ) Jordan/Inman
)
DONALD WAYNE HUFFMAN )
JOHNATHAN BROWNING )
MITCHELL POTTER )
BOBBY JOE AMBROSE )
GREGORY MILLER )
JACQUELINE WIGAND )
SHERRI FINLEY )
ANGELA PERRY )
DANIEL BURLESON )

and


CHRISTOPHER BRAD BAUCOM )
ADAM BOWERS ) No. 2:08-CR-58
JASON B. WOODY ) Jordan/Inman
LESLIE R. BEALS )
PAMELA R. MILLER )
CARSON DEAN MULLINS )
DONNA MANESS )
ANGELA FALIN )
ADAM BIRCHFIELD )
JESSICA BAUMGARDNER )


## REPORT AND RECOMMENDATION

Defendant Bobby Joe Ambrose is charged with conspiring to distribute methamphet-

amine (count 1); conspiring to manufacture methamphetamine (count 2); possessing the

chemicals, equipment, and materials needed to manufacture methamphetamine (count 7);

maintaining a residence at 106 Union Street in Erwin, Tennessee for the purpose of manufacturing and distributing methamphetamine (count 15); possessing a firearm in furtherance of the preceding drug trafficking offenses (count 18); and being a convicted felon in possession of a firearm (count 19). At least some of the evidence that will be used by the United States as part of its proof was discovered during the execution of a state search warrant issued on April 22, 2008, by Judge Robert Cupp of the Criminal Court for the Second Judicial District of the state of Tennessee. Defendant has filed a motion to suppress that evidence, (Doc. 127), asserting that the search warrant was invalid because of deficiencies in its issuance and execution, and because the affidavit failed to establish probable cause. This motion has been referred to the magistrate judge pursuant to the standing order of this Court and 28 U.S.C. § 636. An evidentiary hearing was held on February 4, 2009, which was resumed on February 11, 2009.

### THE APPLICATION AND AFFIDAVIT

During the late-night hours of April 22, 2008, Major Michael Hensley and other officers of the Unicoi Sheriffs Department went to the home of Criminal Court Judge Robert Cupp to obtain a warrant to search the residence of Bobby Joe Ambrose at 106 Union Street in Erwin, Tennessee, for evidence of drug trafficking and illegal firearms. Major Hensley's affidavit reads as follows:

> Personally appeared before me MAJOR MICHAEL HENSLEY and made oath that he has good ground and belief, and does believe that BOBBY JOE AMBROSE is/are in possession of the following described property, namely: METHAMPHETAMINE,

2

METHAMPHETAMINE PRECURSORS, CONTRABAND, DRUG PROCEEDS, DRUG RECORDS, DRUG PARAPHERNALIA, ILLEGAL FIREARMS, to be searched for in accordance with the Laws of the State of Tennessee, upon the following described premises, namely: FROM THE SHERIFF'S DEPARTMENT PARKING LOT TURN LEFT ONTO MAIN STREET, TRAVEL TWO BLOCKS TO THE INTERSECTION OF MAIN AND UNION STREET, TURN RIGHT ON UNION STREET, LOCATION TO BE SEARCHED WILL BE THE FIRST BRICK BUILDING ON THE LEFT AFTER MOUNTAIN COMMERCE BANK PARKING LOT. THE ADDRESS IS 106 UNION STREET, THE NUMBER 106 IS ON THE OUTSIDE OF THE BUILDING. AND HAS REASONS FOR SUCH BELIEF ARE THAT AFFIANT HAS ILLEGAL NARCOTICS,, METHAMPHETAMINE PRECURSORS, CONTRABAND, DRUG PROCEEDS, DRUG RECORDS, DRUG PARAPHERNALIA, ILLEGAL FIREARMS. WITHIN THE LAST 72 HOURS, A CONFIDENTIAL AND RELIABLE INFORMANT, WHO HAS GIVEN RELIABLE INFORMATION IN THE PAST THAT HAS LED TO AT LEAST TWO ARRESTS AND CONVICTIONS, STATED THAT HE/SHE SAW APPROXIMATELY 4 TO 5 GRAMS OF METHAMPHETAMINE (A SCHEDULE TWO NARCOTIC), APPROXIMATELY 6 GRAMS OF MARIJUANA (A SCHEDULE SIX NARCOTIC), AND APPROXIMATELY FOUR XANAX PILLS (A SCHEDULE FOUR NARCOTIC) IN A GARAGE AT THE ADDRESS LISTED ABOVE. A RECORDS CHECK OF EPHEDRINE PURCHASES AT PHARMA-CIES IN THE SURROUNDING AREA REVEALED THAT KNOWN ASSOCI-ATES OF BOBBY J. AMBROSE AND HE HIMSELF HAD PURCHASED IN THE LAST SEVEN DAYS AT LEAST TEN BOXES OF EPHEDRINE WHICH IS A KEY INGREDIENT IN THE MANUFACTURE OF METHAMPHETAMINE , THE INFORMANT STATED THE EPHEDRINE WAS BROUGHT TO BOBBY J. AMBROSE FOR THE PURPOSE OF MANUFACTURE OF METHAMPHET-AMINE. THE INFORMANT ALSO STATED THAT WHILE INSIDE THE GARAGE SAW (SIC) A HANDGUN WRAPPED IN A CLOTH ON A SHELF. THE CRIMINAL HISTORY OF BOBBY J. AMBROSE INDICATES THAT HE IS A CONVICTED FELON AND UNABLE TO POSSESS A HANDGUN LEGALLY. GLASS SMOKING PIPES AND MATERIAL FOR MAKING PIPES WERE ALSO OBSERVED BY THE INFORMANT. BASED ON THE FACTS THE AFFIANT REQUESTS THAT THE ENTIRE GARAGE AREA OF 108 UNION STREET AND VEHICLES INSIDE BE SEARCHED FOR THE ITEMS LISTED ABOVE.

He therefore complains and asks that a warrant issue to search the person and premises of BOBBY J. AMBROSE above described in said County, where he believes said personal property above is now possessed.

As an initial matter, the reference to 108 Union Street near the end of the affidavit

was erroneous. The structure at this location was a large building, and apparently began its

life as a garage. At some point, part of the building was partitioned off into extremely small apartments, or "sleeping rooms." The portion of the building containing the apartments or sleeping rooms had a separate entrance, and that section of the building bore the address of 108 Union Street. The portion of the building that contained the garage to be searched (and, as it turned out, the living quarters of the defendant) was designated 106 Union Street.

Major Hensley had never been inside the structure, and was therefore unfamiliar with its layout. When he originally drafted the application, affidavit, and warrant, he described the property as 108 Union Street. However, upon his arrival at Judge Cupp's house, Major Hensley received a call from Sheriff Harris and was told that the address of the garage actually was 106 Union Street, not 108. Using an ink pen, Major Hensley wrote "6" over the typewritten "8" in the first two places the address appeared in the affidavit; both he and Judge Cupp initialed those changes. However, both men failed to correct the address where it again appeared at the very last of the affidavit.[1]

Both Major Hensley and Judge Cupp knew that the premises to be searched was 106 Union Street, evidenced by the two corrections to the address they both initialed in the first part of Major Hensley's affidavit. More importantly, those same changes were made in two separate places on the search warrant itself, and each of those changes were initialized by Judge Cupp and Major Hensley.

---

[1]It is emphasized that apparently even defendant's counsel failed to notice that Major Hensley and Judge Cupp failed to make the correction to the address in the penultimate sentence in the affidavit; it was never mentioned during the suppression hearing. It was noticed by the magistrate judge only as he was dictating aloud Major Hensley's affidavit in preparing this report and recommendation.

A warrant meets the particularity requirement of the Fourth Amendment if the description is such that the executing officer can, with reasonable effort, ascertain and identify the place meant to be searched. *Steele v. United States*, 267 U.S. 498, 503 (1925). Major Hensley and Judge Cupp knew that the place to be searched was the garage at 106 Union Street, and their failure to make that one single correction to the address in Major Hensley's affidavit was and is of absolutely no legal significance.

### *PROBABLE CAUSE*

Defendant focuses upon this sentence in Major Hensley's affidavit: "A records check of ephedrine purchases at pharmacies in the surrounding area reveal that known associates of Bobby J. Ambrose and he himself had purchased in the last seven days at least ten boxes of ephedrine which is a key ingredient in the manufacture of methamphetamine." Defendant argues that this statement was deliberately false and demonstrated a reckless disregard for the truth, as a result of which it should be excluded from the affidavit. Defendant points out that the pharmacy records obtained by him through discovery reveal that defendant purchased no pseudoephedrine after February 19, 2008. Since Major Hensley's affidavit was executed on April 22, the defendant suggests that the statement in the affidavit that he had purchased pseudoephedrine "within the last seven days" was deliberately false and recklessly made. He then goes on to argue that this statement was necessary to Judge Cupp's determination of probable cause, as a result of which the affidavit lacked probable cause, citing *Franks v. Delaware*, 438 U.S. 154 (1978).

The problem with defendant's argument is that the affidavit recites that *known*

*associates* of defendant, as well as defendant himself, had purchased ten boxes of ephedrine within the past ten days, and that the ephedrine "was brought to [defendant] for the purpose of manufacture of methamphetamine." Even if the words "he himself" are excised from the affidavit, what remains is a recitation that "known associates" of Mr. Ambrose had purchased pseudoephedrine within the past ten days and delivered that ephedrine to him to be used in the manufacturing of methamphetamine. Probable cause still existed even with the omission of the words "he himself." Indeed, even if the entire sentence concerning the pharmacy records is excised, the affidavit still stated probable cause for the issuance of the warrant. *See, Franks, supra*, at 155-56.

### DEFECTS IN THE ISSUANCE AND THE EXECUTION OF THE WARRANT

*(a) Failure to Sign the Warrant*

As pertinent to defendant's motion, Rule 41(d) of the Tennessee Rules of Criminal Procedure requires that the judge prepare an original and two exact copies of each warrant; one copy is for the judge's records, another is to be left with the person upon whom the warrant is served, and presumably the third copy (or original) is filed with the court after the officer has made his return thereon. Rule 41(c)(2)(D) requires that the judge shall endorse on the search warrant the hour, date, and name of the officer to whom the warrant is delivered for execution. Rule 41(e)(4) directs that the executing officer leave a copy of the warrant and a receipt for the property seized at the place from which the property is taken. The easiest, not to mention safest, way to comply with Rule 41(d) is for the applicant to prepare *one* copy of the application/affidavit/warrant, to sign that

6

application/affidavit before the judge, for the judge to sign that single copy, *and thereafter the judge to photocopy that single copy in order to produce the two exact copies required by the state rule.* However, presumably on the assumption that Judge Cupp did not have a photocopy machine at his home, Major Hensley prepared three "copies" (in reality, three originals) of the application/affidavit/warrant. It was then incumbent upon both men to sign all three documents in every place indicated, a procedure that invited a mistake, sooner or later. Due to the numerous hand-written corrections on each of these three copies which were initialed by both men, and the need for repetitive signatures, the likelihood of omitting a needed signature or other information on one of the versions exponentially increased. And that is precisely what happened.

Major Hensley signed his affidavit on all three copies where he was required to do so, and of course he initialed every hand-written change to the address of the place to be searched on all three copies. Similarly, Judge Cupp signed every copy beneath Major Hensley's affidavit, and he likewise initialed every hand-written alteration on every copy. On one of the copies, Judge Cupp noted the date and time of issuance, "4-22-08, 10:55 p.m.", he filled in the name of the executing officer, and he then affixed his signature to it. [Ex. 3]. It was this copy that Judge Cupp retained in his possession, and it complied with every relevant provision of state Rule 41. However, on another copy of the warrant, although he noted the date and time of issuance, and the name of the executing officer, he failed to sign it. [Ex. 1]. On the third copy of the warrant, although he filled in the name of the executing officer, he failed to both sign the warrant and note the date and time of its

7

issuance. [Ex. 2]. It was one of the unsigned versions of the warrant that ultimately was left with the defendant. Judge Cupp's failure to place his signature on two of the copies, and his failure to note the date and time of issuance on one of them, was due to distraction, inadvertence, and oversight. As evidenced by the fact that he signed one of the warrants, it is beyond argument that he would have signed all three; moreover, he so testified. The form customarily used by Tennessee state officers for search warrants is a pre-printed, boilerplate, fill-in-the-blank form that has been long used in Tennessee. It is on a single sheet of legal-sized paper, with the affidavit (which also serves as the application) on one side, and the search warrant and return on the other. It is a confusing mass of pre-typed words and blank lines crammed into a relatively small space, and one that the state attorneys general should discourage the use of. Nevertheless, their use persists. Presented as he was with three copies, all of which had to be corrected and initialed multiple times, and all of which had to be signed multiple times, it is understandable how Judge Cupp made the errors he did, especially at the time of night the task was thrust upon him.[2] Nevertheless, errors they were, and there is no doubt that the omissions in two of the three copies would invalidate the search warrant under state law and would require a state court to suppress any evidence seized pursuant to that warrant. *See, e.g., State v. Steele*, 894 S.W.2d 318 (Tenn. Crim. App. 1994).

---

[2]It was an oversight with which this author can empathize. In 2005, this magistrate judge was presented with an application and affidavit for a search warrant for a business establishment in Sneedville, Tennessee, and he signed the application, affidavit, and the sealing order. To his ultimate chagrin and embarrassment, however, he failed to sign the search warrant itself, and neither the executing officer nor the Assistant United States Attorney noticed that oversight until the warrant had been executed.

Defendant argues that since this was a state search warrant executed by state officers, without any participation of federal officers, its validity must be determined in accordance with state law and state procedural requirements. Since two of the three copies did not comply with state Rule 41, and any evidence seized thereunder would be suppressed under state law, he argues that this court is likewise bound to suppress the evidence, relying on *United States v. Bennett*, 170 F.3d 632 (1999).

*Bennett* involved a Kentucky state search warrant, issued by the *circuit court clerk*, and executed by state officers. The defendant in *Bennett* argued that since the Sixth Circuit has long held that federal law, not state law, governs the validity of a search warrant in a federal criminal proceeding, the requirements of federal Rule 41(a) of the Federal Rules of Criminal Procedure should control. Defendant contended that since there is no authorization in federal Rule 41(a) for a court clerk to issue a search warrant, the warrant was invalid.

The Sixth Circuit held "that simply because federal law governs the validity of a search in a federal prosecution, it does not automatically follow that Rule 41(a) applies to the search in question," *id.*, 635, and that is the crux of the *Bennett* holding. But it is two other sentences in *Bennett* that give pause. First, the court said: "[T]he validity of a search warrant obtained by state officers for seizure of evidence ultimately used in a federal prosecution turns *only* on constitutional issues." (Italics supplied). *Id.* But, two paragraphs later, the court said, "the validity of the search warrant in this case must be tested to Kentucky criminal procedural requirements and the Constitution." *Id.*, 636. It is this latter

9

sentence upon which defendant understandably relies. Facially, the two sentences cannot be reconciled. Is this court's analysis to be governed *only* by constitutional law, or is it to be governed by constitutional *and* state procedural law?

In *United States v. Walton*, 2003 WL 21456253 (6th Cir. 2003), evidence seized by state officers during the execution of a state search warrant was used in a federal prosecution before Judge Alan Edgar of this district. The state judge who issued the warrant allowed the affiant to supplement his affidavit by oral testimony, and it was upon that basis that the defendant appealed to the Sixth Circuit, complaining that "Tennessee law prohibited the issuing judge from considering this testimony." *Id.*, at **2. The Sixth Circuit panel quickly disposed of the defendant's argument stating that "it is well settled that federal law governs the question of the validity of a search warrant in a federal proceeding . . . [and] . . . [u]nder federal law, the issuing magistrate judge may take into account oral information provided by the affiant as long as it is provided under oath." *Id.* Obviously, in *Walton* the Sixth Circuit was unconcerned with Rule 41 of the Tennessee Rules of Criminal Procedure, and to that extent *Walton* appears to be in conflict with the second quoted sentence in *Bennett*.

*United States v. Fields*, 978 F.2d 943 (6th Cir. 1992), is another "oral supplementation" case, emanating from Michigan: "[T]his Court must decide whether evidence seized with a search warrant obtained by state law enforcement officers from a state court judge should be suppressed in a federal prosecution because the affidavit in support of the search warrant was orally supplemented under oath." *Id.*, 944. First, the appellate panel

concluded that federal law, not state, controlled the question of the validity of the search warrant. Second, the court held that since there was no federal constitutional proscription against sworn oral supplementation of an affidavit filed in support of a search warrant, the warrant at issue passed muster and evidence seized thereunder would not be suppressed. *Id*., 946.

In *United States v. Franklin*, 2008 WL 2611337 (6th Cir. 2008), the defendant was charged in the district court for the Western District of Tennessee with being a felon in possession of firearms. The evidence against him was seized by state officers in Madison County, Tennessee, under a warrant issued by the general sessions court judge for Henderson County, Tennessee. Arguing that a sessions court judge from Henderson County did not have the statutory authority to authorize a search in Madison County, the defendant moved to suppress the evidence. The district judge denied the motion to suppress and it was upon that basis that the defendant appealed. The Sixth Circuit noted that it was unclear whether the Henderson County sessions court judge had followed the required statutory procedure to sign a search warrant "by interchange" for property in Madison County. Finding that question to be irrelevant, the Sixth Circuit panel pointed out that the defendant was tried in federal court and, "[s]ince the warrant here was granted in compliance with the requirements of the Fourth Amendment, we hold that the warrant was valid."

In defendant's second supplemental brief filed on February 18, 2009, he asserts that *United States v. Maholy*, 1 F.3d 718 (8th Cir. 1993), supports his argument. Respectfully, the court disagrees. Actually, it supports the United States' position. In

*Maholy*, state officers obtained a search warrant from a state judge. The warrant authorized the officers to search at any time of the day or night. Under Arkansas procedural law, the affidavit filed in support of the application for the warrant not only had to state probable cause for the search itself, it also had to state probable cause for a nighttime search. The affidavit did not establish probable cause for a nighttime search, so the defendant argued, and he moved to suppress the fruits of the ensuing search. The Eighth Circuit court stated that, "[i]n determining whether evidence obtained solely by state officers is admissible in federal court in the first instance, it is usually irrelevant whether a state rule of criminal procedure was violated." *Id*., 721. The court went on to say that the defendant's claim that the nighttime search violated an Arkansas procedural rule "is irrelevant to determining, at least in the first instance, whether the fruits of the search are admissible in federal court." *Id*. "When evidence obtained by state law enforcement officers is offered in a federal prosecution, 'the legality of [the] search and seizure is not determined by reference to a state statute, but rather is resolved by fourth amendment analysis.'" *Id*.

After concluding that the Arkansas procedural rule was irrelevant to its analysis, the Eighth Circuit panel turned its attention to the Fourth Amendment: was the nighttime search of the defendant's residence violative of the Fourth Amendment because the affiant's affidavit failed to establish probable cause for such a nighttime search? The court remarked that there was no reason to reach that issue since, "even if the nighttime search violated the Fourth Amendment, the fruits of the search were admissible under *United States v Leon . . . .*" *Id*. The court then made this critical statement: "[A]lthough state law

12

is irrelevant for determining the first instance whether fruits of a search are admissible in federal court under the Fourth Amendment, state law is relevant when the analysis proceeds to the question of admitting unconstitutionally seized evidence under *Leon's* good faith exception to the exclusionary rule." *Id.*, 722. In other words, state procedural law comes into play only when *Leon* also comes into play.

Again, *Maholy* does not in any way support the defendant's argument that Judge Cupp's search warrant, since it would be declared invalid by a state court, likewise should be declared invalid by this court.

To be candid, this magistrate judge does not know quite what to make of the sentence in *Bennett* that indicates that both federal constitutional law and state procedural law was considered in resolving that case, notwithstanding the earlier sentence in *Bennett* that indicated that only federal constitutional law was relevant. It bears noting that *Walton*, *Fields*, and *Franklin*, all Sixth Circuit cases, indicate that the court did not resort to state procedural law in deciding those cases. And *Maholy*, from the Eighth Circuit, indicates that a federal court looks to state procedural law only when the analysis proceeds to the point that *Leon* is potentially implicated. Therefore, this court concludes that federal constitutional law, not state substantive or procedural law, and not federal procedural law, will govern the validity of this state search warrant. Only if the warrant violates the Fourth Amendment is this court to look to state Rule 41 in deciding whether *Leon* should save the search.

This warrant did not violate the Fourth Amendment. Rule 41 of the Tennessee Rules of Criminal Procedure contains a number of "technical niceties" involving

13

the issuance and execution of state search warrants. None of those "technicalities" are mandated by the Fourth Amendment to the United States Constitution, which only requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Fourth Amendment says nothing about "three exact copies;" it says nothing about noting the date and time of issuance on the warrant; and it says nothing about leaving a copy of the warrant with the person whose property was searched. Even had Judge Cupp unintentionally failed to sign every copy of the warrant, there would have been no violation of the Fourth Amendment:

> [T]he fact that the original [state] search warrant was not signed does not establish that the search violated the Fourth Amendment. It may have been defective under Michigan law, but it was not invalid under the Constitution.

*Brown v. Wassus*, 2000 WL 1597940 (6th Cir. 2000).

It must be recalled that Judge Cupp *did* sign one of the copies [Ex. 3]. Although it was the one he retained, it was no less a warrant because he had it in his possession. Any dispute regarding the legitimacy or accuracy of the other two copies could have been immediately settled by reference to the one kept by the judge. The state procedural requirement for two exact copies were technical and ministerial requirements that had no bearing or effect on the substantive fact that a judge authorized a search after finding probable cause to justify that search.

As already stated, Judge Cupp intended to sign all copies of the warrant,

and his failure to do so was an oversight. The whole point to the Fourth Amendment's requirement for a warrant is that an independent, neutral, and detached magistrate should first determine that probable cause exists for the requested search, and that occurred.

Judge Cupp's failure to note the date and time of issuance of the warrant on two of the copies does not constitute a violation of the Fourth Amendment for precisely the same reasons as discussed above.

*(b) Failure To Leave A Copy Of The Warrant With Defendant*

Defendant next argues that Rule 41(d) of the Tennessee Rules of Criminal Procedure requires that one copy of the search warrant must be left with the person on whom the search warrant is served. He says that he was not given a copy of the search warrant, as Rule 41(d) of the Tennessee Rules of Criminal Procedure requires.

Defendant was arrested during the execution of the search warrant. Although Major Hensley verbally told defendant of the existence of the search warrant, and read its contents to him, he did not provide defendant a copy of the search warrant *at that time*. However, Major Hensley hand-delivered a copy of the warrant to the defendant later that night at the Unicoi County Jail.

First, even if state procedural rules applied in this case, there does not appear to be a violation of Rule 41(d). Nothing in the state rule sets a time limit on when a copy of the warrant is to be delivered to the individual. Beyond any doubt, providing a copy within the next twelve hours or so would constitute sufficient compliance with Rule 41(d). In any event, as already discussed, state Rule 41(d) has no bearing on this court's analysis;

15

only federal constitutional requirements come into play, and a failure to provide defendant a copy of the search warrant simultaneously with its execution is not a violation of the Fourth Amendment to the United States Constitution. *Darmon v. Burgess*, 388 F.3d 609 (8th Cir. 2004) (failure of officers to leave a copy of the search warrant did not render the search unreasonable); *United States v. Simons*, 206 F.3d 392, 403 (4th Cir. 2000) (failure to leave a copy of the warrant did not render the search unreasonable under the Fourth Amendment).

*(c) Applicability of United States v. Leon, 468 U.S. 897 (1984).*

Although Tennessee has declined to adopt a good-faith exception to the exclusionary rule akin to *Leon*,[3] there is no doubt *Leon* potentially can apply in a federal court prosecution even if the evidence was seized pursuant to a state search warrant. *See, e.g., United States v. Beasley*, 2000 WL 33725116 (W.D. Tenn. 2000).

Assuming only for purposes of the following discussion that this search warrant was invalid under the Fourth Amendment, *Leon* nevertheless is applicable and saves the evidence seized pursuant to that warrant.

The Fourth Amendment itself does not preclude the use of evidence obtained in unreasonable searches and seizures. The exclusionary rule, which of course prohibits the use of such evidence, is a judicial remedy created to deter officers from violating the Fourth Amendment. *Leon*, 468 U.S. at 906. *Leon*, of course, created an exception to the exclusionary rule - when an officer acts with objective good faith, in reliance on a search warrant obtained from a judge, and the officer acts within the scope of the

---

[3]*State v. Carter*, 16 S.W. 3d 762, 769. fn. 8, (Tenn. 2000).

warrant, the exclusionary rule will not arise. *Id.*, 920.

Just as Judge Cupp was distracted, so was Major Hensley. The hour was late, and he and Judge Cupp had made numerous corrections to three copies of a search warrant. Each man had written much, and signed their names often. Major Hensley had observed Judge Cupp sign his name time and again, on the three documents. Recalling again the nature of these preprinted warrant forms, Hensley's failure to observe the omissions on the two versions with which he left is more than excusable. He had presented his case for probable cause, Judge Cupp accepted it, and Major Hensley knew that Judge Cupp found probable cause. He then executed that warrant, notwithstanding that he was unknowingly armed with unsigned copies.

What will application of the exclusionary rule accomplish in this case? The exclusionary rule is intended to deter police misconduct; it is not intended to punish a tired and distracted judge who failed to complete a purely ministerial task, and it is not intended to be a technical trip-wire to frustrate justice.

*Leon*'s good-faith exception should apply here if there was a Fourth Amendment violation. It is emphasized however, that there was no such violation.

*(d) Search Exceeding the Scope Of The Warrant*

Judge Cupp's warrant described the place to be searched as the brick building located at 106 Union Street in Erwin. Insofar as that description in the warrant is concerned, it was completely adequate and acceptable under the Fourth Amendment; a warrant satisfies the particularity requirement of the Fourth Amendment if the executing officer can, with reasonable effort, identify the place to be searched. *Steele, supra*, at 503.

However, Major Hensley's application/affidavit sought a warrant for "the entire *garage* area of 108 (sic: 106) Union Street and vehicles *inside*." [italics supplied]. Thus, Judge Cupp's warrant should be read as authorizing a search for the garage area at 106 Union Street, not the entire structure at that address, as well as any vehicles found inside that garage.

Defendant complains that the officers searched not only the garage, but also his apartment at 106 Union Street, the attic area above the garage, his mother's apartment (which apparently was in 108 Union Street), a boarder's room at 108 Union Street, and his vehicle which was parked outside the garage.

Although defendant does not explicitly so state, he is arguing that the officers' search exceeded the authorized scope of the warrant, as a result of which all evidence seized pursuant to the warrant should be suppressed.

So-called general warrants are the antithesis of, and proscribed by, the "particularity requirement" of the Fourth Amendment which mandates that search warrants particularly describe the place to be searched. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). A search that is commenced pursuant to an otherwise valid warrant may metamorphosis into an invalid general search if the officers "flagrant[ly] disregard . . . the limitations of [the] search warrant." *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985). An executing officer is said to flagrantly disregard the limitations of a warrant when he "exceed[s] the scope of the warrant in the places searched." *See, Waller v. Georgia*, 467 U.S. 39, 43, n.3 (1984). The test for determining if the officers engaged in an impermissible general search is whether their search *unreasonably* exceeded the scope of the warrant. *Brindley v. Best*, 192 F.3d 525, 531 (6th Cir. 1999). Although one remedy for a general search is suppression

of all evidence seized, *United States v. Lambert*, 771 F.2d 83, 93 (1985), a blanket or general

exclusion of all evidence seized pursuant to an otherwise valid warrant is an extraordinary

remedy that should be imposed only when the officer's violations were "extreme." *United*

*States v. Garcia*, 496 F.3d 495, 507 (6th Cir. 2007).

Initially, this court thought it odd that Major Hensley requested a warrant

to search only the "garage area" at 106 Union Street. The information he had would have

supported a search of defendant's apartment since drug dealers often keep records relating to

their illegal activity in their homes. Further, the apartment was immediately adjacent to the

garage. However, after hearing his testimony and the testimony of various other officers who

assisted in the execution of the warrant, it is apparent that Major Hensley believed that 106

Union Street consisted *only* of a garage; from the outside, that is what it appeared to be. As

discussed briefly in an earlier part of this report, 106 and 108 Union Street is a single building,

which apparently was originally constructed as a huge garage. At some point in time, the

interior of the building was partitioned into different segments. From the perspective of a

person standing at the front of the building on Union Street, 106 Union Street is served by a

large garage door, and a smaller pedestrian door immediately to the left of the garage door.

Even further to the left is another pedestrian door that bears the address "108." Simply by

looking at the structure from the outside, one cannot tell what lays within. From the testimony

presented during the hearing, the entry door to 108 goes into an area completely segregated

from the "106 section," and which contains numerous sleeping rooms, or small apartments.

If one enters the pedestrian door marked 106, he would find himself in a hallway which in

turn has two other doors, one of which leads to the garage area to be searched, and another

of which leads to a door that opens into defendant's apartment dwelling.

Officers did enter the attic or storage area above the garage, and they even went upon the roof; but those officers were not "searching" for contraband, they were looking for *people*. Defendant was suspected of manufacturing and trafficking in methamphetamine. The chemicals used in the manufacture of methamphetamine are extremely toxic and dangerous. The officers ultimately evacuated the building during the search, and it was necessary to find out who was in the building, and where.[4] The attic area and garage were easily and quickly accessible to each other, and it was only prudent precautionary measure to look into the attic area to see if anyone was hiding there. The officer's "search" of the attic was nothing more than a cursory look to confirm that no one was in it. It was for this same reason that an officer went upon the roof.[5]

The officers admittedly entered 108 Union Street, but they did so because they had information that one of the boarders in a particular room had overdosed on methamphetamine and could be dying, or dead. They requested that defendant's mother open the individual's room solely for a "welfare check." Defendant's mother cooperated in this regard and, after confirming that the room was empty, the officers left.

The officers also searched defendant's private residence, which was located in 106 Union Street, adjacent to the garage. However, the "search" of defendant's apartment, such as it was, not only was with defendant's consent, it was at his direction. Inside the

---

[4]There was conflicting testimony regarding the evacuation of the building; the testimony of the officers is accepted, and defendant's contrary evidence is not.

[5]Defendant's mother's testimony that an officer was in the attic and on the roof for thirty or more minutes was not believed, and is rejected.

garage the officers had observed a soft drink vending machine, and they understandably wished to open it. Not wanting to break into the machine and essentially destroy it, they asked defendant for the key to it, and he agreed. Defendant told them that the key would be in either of two places, in his apartment in a nightstand drawer, or in his SUV, which was parked outside the garage. An officer went to the apartment, and told defendant's wife that her husband had said that the key to the drink machine was in the nightstand drawer. Defendant's wife went to that nightstand and opened the drawer, and the officer stood over her shoulder as she did so, shining a flashlight into the drawer. Once again, the officer's presence and observation was nothing more than commonsensical prudence, since the drawer could have contained a firearm. Although the key was not found in the drawer, the officer observed in plain view a small bag of what appeared to be marijuana, and the officer seized it.

There was no search of the apartment, beyond that described above. And even that was not truly a search. The officer only reported to Mrs. Ambrose what her husband had said about the location of the key, and the officer merely watched Mrs. Ambrose as she looked for the key in the nightstand drawer. As she did so, the officer observed the small bag of marijuana. Since it was in "plain view," and its incriminating nature immediately apparent, it was properly seized. *See, e.g., Horton v. California*, 496 U.S. 128 (1990).

It was the officer's request for the key to the vending machine that also lead to the search of the SUV in the driveway. As mentioned, defendant told the officers that the key could be located in either his apartment in the nightstand, or perhaps in the SUV. He was asked if officers could look in the SUV, at which point he asked if his vehicle would be

seized. The officer responded that it would not be seized unless contraband was found within it. At that point, defendant told the officer that there was no contraband inside the vehicle, and the officer should go ahead and search it. Based upon defendant's consent, the SUV was searched and, as defendant predicted, nothing was found.

The only incriminating evidence seized outside the confines of the garage was the small bag of marijuana found in defendant's apartment. As already discussed, to the extent that marijuana could be said to have been found as a result of a search, it was a search undertaken with the defendant's explicit consent. Similarly, the search of the SUV was with defendant's consent. The attic area above the garage was not searched for contraband, but only cursorily examined to confirm that there was no one hiding within the area. Lastly, there was no search of the boarder's room at 108 except to the extent necessary to confirm that there was not a drug overdose victim within that room, and even that was done with the consent of defendant's mother, who had at the very least joint control over that portion of the building.

### CONCLUSION

There is no basis to suppress evidence of the material found in the garage, or the marijuana found in defendant's apartment. Under federal constitutional law, the defects in the warrant and its execution were not Fourth Amendment violations; assuming there were Fourth Amendment violations, the officers acted in good faith and the *Leon* exception to the exclusionary rule should apply; the officers did not exceed the scope of the warrant; and the marijuana was discovered as a result of the defendant's consent for an officer to look into his night stand drawer.

## *RECOMMENDATION*

It is respectfully recommended that defendant's Motion to Suppress [Doc. 127] be

**DENIED.**[6]

Respectfully submitted,

s/Dennis H. Inman
UNITED STATES MAGISTRATE JUDGE

---

[6]Any objections to this report and recommendation must be filed within ten (10) days of its service or further appeal will be waived.  28 U.S.C. § 636(b)(1)(B) and (C).  *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).